### 11817

## ATLANTIC SAVINGS BANK OF CHARLESTON v. ROWLAND ET AL.

### (130 S. E., 57)

1. Executors and Administrators—Evidence Held to Sustain Finding of Validity of Claim Against Estate.—Evidence *held* to sustain finding that orphan aid society's claim against estate for erection of bakery under decendent's promise to defray expenses was valid and not fictitious.

2. Appeal and Error—Finding of Trial Judge in Equity Suit Not Disturbed on Appeal Unless Against Preponderance of Evidence.—Finding of trial judge in suit in equity will not be disturbed on appeal unless against preponderance of evidence, burden of showing which is on appellant.

3. Reference—It is Duty of Master to Take all Testimony Offered and Report it to Court.—It is duty of master to take all testimony offered and report it to court.

4. Appeal and Error—Trial Court Presumed Not to Have Considered Incompetent Testimony Reported by Master Taking it.—It will be presumed that incompetent testimony taken by the master and reported to court, was not considered by court in making his conclusions as to facts of case.

Before MEMMINGER, J., Charleston, June, 1924.   Affirmed.

Action by the Atlantic Savings Bank of Charleston as administrator of the Estate of Henry Archibald Duc, deceased, against Thomas F. Rodland, Jr., and others, whereby plaintiff sought instructions as to payment of a claim made by certain defendants against the estate.   From a judgment sustaining validity of the claim, plaintiff and certain defendants appeal.

The following is the decree of the Circuit Court:

"This cause comes before me upon exceptions to the master's report, filed herein, April 19, 1924.

"The controversy arises out of effort on the part of the plaintiff, Atlantic Savings Bank, and the defendants, Thomas F. Rowland, Jr., Charles B. Rowland, George Tibbals, and Samuel Tibbals, the latter wealthy iron manufacturers of Brooklyn, N. Y., and devisees under the will of Duc, to avoid the payment from the estate of Duc, a lifelong citizen of Charleston, S. C., of a claim of $15,000, upon a contract between Duc and the Orphan Aid Society of the Jenkins Colored Orphanage, for the construction of a certain bakery, known as the Poor Child Bread Company. The master decided adversely to the claimant, and accepted the reasoning of the joint argument submitted by Mr. Henry Buist, attorney for plaintiff, Atlantic Savings Bank of Charleston, and Mr. George L. Buist, attorney for the devisees.

"The exceptions, four in number, raise substantially but two points: (1) The competency of the witness Jenkins under Section 708 of the Code of 1922; and (2) error on the part of the master in holding the estate of Duc not liable to the claimant, the Orphan Aid Society of the Jenkins Colored Orphanage for the amount claimed in this action. For a proper understanding of the question, a brief review of the facts is essential:

"The proceeding was brought on the face of the papers by plaintiff, Atlantic Savings Bank of Charleston, S. C., administrator c. t. a. of the estate of Henry Archibald Duc, deceased, for instructions from the Court in reference to a claim of defendant, the Orphan Aid Society of the Jenkins Colored Orphanage, duly filed with it, dated April 21, 1922, and reading as follows:

" 'To money advanced and expended for the erection and equipment of a building, at 27 Franklin Street, Charleston, S. C., known as "the Poor Child Bread Company," at the special instance and request, and under the authority and direction, of Mr. Henry A. Duc— $15,000.00.' For convenience the Orphan Aid Society of the Jenkins Colored Orphanage will be referred to hereinafter as the Orphanage.

"Both the Orphanage and D. J. Jenkins were made defendants. They filed a joint answer, alleging that on or about April 1, 1920, Duc (who died on September 29, 1920), visited the Orphanage, in the city of Charleston, conducted by them, and proposed to Jenkins, its president (the Orphanage being an incorporated institution), the erection of, at his (Duc's) expense, what is known as two 'Poor Child Bread Companies' in the city of Charleston for the purpose of manufacturing, baking, and distributing bread among the poor colored children and people of the colored race in the city of Charleston; that the Orphanage has been in existence for many years, in the city of Charleston, working entirely among the negro race of that city, for the purpose of educating, supporting, and training destitute and orphan children of that race; and that Duc, who throughout his life took an active interest in the development, education, and uplift of the colored race, authorized and requested the erection, at his expense, on Franklin Street in the city of Charleston, of a building for the purposes referred to; that such building was erected at a cost of $15,-000, which sum was advanced by the Orphanage in reliance upon the promise, request, and agreement of the

said Duc, to pay for the same. Judgment for this amount and interest is asked on behalf of the Orphanage.

"The answer of defendants, Thomas F. Rowland, Jr., Charles B. Rowland, George Tibbals, and Samuel Tibbals denies knowledge of any action taken on behalf of the plaintiff in respect to the administration of the estate; and denounces the claim as 'a fictitious claim, and unsupported by any facts whatsoever,' etc. This answer is signed by George L. Buist, Esq., attorney for the said last named defendants, as well as the defendants 'the Orphan Aid Society of the Jenkins' Colored Orphanage, and D. J. Jenkins.' This is obviously a mistake, however, because, as appears throughout, and from the above summarized answer of the last two named defendants, Mr. Buist is not their attorney, and their interests are entirely and sharply antagonistic.

"The chief witness offered by the Orphanage in support of its claim was its codefendant and president, Rev. D. J. Jenkins. Objection to this testimony (under Section 708 of the Code) as to transactions had between him and the said Duc, deceased, was made by counsel opposed to the claim. The master, at the hearing, sustained this objection upon the ground as reported: 'That the witness, having testified that he is president of the defendant the Orphan Aid Society of the Jenkins Colored Orphanage, and not as an individual, any transactions between him in his official capacity as an officer of the society and the deceased abide by the Statute.' Record, page 8. The testimony, however, of course, was taken, subject to this objection and ruling.

"In his report, however, the master seems to have reversed this ruling. In his report he seems to expressly decide that the witness was not disqualified by reason of being 'a party to the action or proceeding nor as a person having an interest that may be affected by the event of the trial,' these disqualifications being the recognized subdivisions (a) and (b) of Section 708. And further, the master seems to have decided that 'Jenkins as a paid official of the corporation would hardly be held to have a disqualifying interest.'

"Subdivisions (c) and (d) of the Statute as set out in the report are: (c) 'A person who has such an interest, but which has been in any manner transferred to, or has in any manner come to, the party to the action or proceeding.' (d) 'As assignor of a thing in controversy in the action.' Under these two subdivisions, the master held the witness disqualified, reporting: 'It is clear that the only parties to such an arrangement or contract were Henry Archibald Duc and D. J. Jenkins; that the interest therein of D. J. Jenkins was thereafter transferred by him to the Orphan Aid Society of the Jenkins Colored Orphanage, and that Jenkins is disqualified under Sections 3 and 4 above set out, the defendant Orphan Aid Society having no claim against the estate of Duc other than such contract or agreement as may have been assigned to it by D. J. Jenkins.' Report, page 3.

"The finding of competency under subdivision (b) and disqualification under subdivision (c) appear clearly inconsistent and irreconcilable. If Jenkins was not 'a person having an interest that may be affected by the event of the trial,' under subdivision (b), by what reasoning can he subsequently be declared incompetent as 'a person who has had such an interest, but which has been in any manner transferred to, or has in any manner come to, a party to the action or proceeding,' under subdivision (c).

"The master seems to have clearly recognized this dilemma, and disqualified this witness 'as assignor of a thing in controversy in the action,' under subdivision (d), reporting:

" 'The defendant, Orphan Aid Society, having no claim against the estate of Duc other than such contract or agreement as may have been assigned to it by D. J. Jenkins.' Report, page 3.

"The Orphanage now contends before me that there is absolutely no testimony to support this holding, and I have found none. On the contrary, I find ample evidence show-

ing that the transaction or agreement was had between the said Duc and the Orphan Aid Society through its president, Rev. D. J. Jenkins.

"The witness Jenkins testified that the Orphan Aid Society of the Jenkins Orphanage is a corporation (incorporated in 1892), and that he is the president; that in the summer of 1920, the Orphanage erected the building on Franklin Street (record, page 6); that the Orphanage actually paid for erecting the building at a cost of over $15,-000, and borrowed money to pay for it (record, page 71); that Duc came to his 'place' (the Orphanage, presumably), several times and ordered him to erect the building (page 8); that he had no personal interest in the money to be used for erecting the building (page 24); that the Orphanage owned the lot on which the building was erected and had owned it for 20 or 30 years (page 30); and that Duc selected the site (page 31).

"The witness Jeannette Moore testified that the proposition of Duc to erect this building was submitted to the board of managers of the Orpanage at one of their regular meetings, and the erecting of the building was then authorized (page 34).

"The evidence further reveals through the witness Edna May Clement, the bookkeeper of the Orphanage, that the itemized statement of the claim in evidence was made up from the books of the Orptanage (page 36); that the items were carried as repairs and improvements in the ledger of the Orphanage as applicable to this building, though no special account was opened in Duc's name (pages 37, 38).

"Besides, not only the foregoing, but the whole testimony negatives completely the suggestion that Duc's arrangement was with Jenkins individually, or that Jenkins had any personal interest in the funds to be used for the erection of this building. No suggestion of an 'assignment' of the claim can anywhere be found. The claim, as filed with

plaintiff, was solely on behalf of the Orphanage. The answer prays judgment for the Orphanage only.

"I think, therefore that there was error in holding the witness Jenkins incompetent, and the exception to the holding is sustained.

"As to the merits: I think the whole mistake which has been made by the bank, administrator, and the devisees, in so vigorously contesting this claim, is that they have looked upon it as bogus and trumped up throughout, whereas the direct testimony and the chain of circumstances render that view entirely untenable. The bank knew and the devisees knew the basic facts of the sincerity of Jenkins; and as the master finds that he had long been carrying a commendable work on, and that Duc was interested in such work and got Jenkins into the idea of the poor children's bread project. They knew, also, that, in a former will, he had provided for this Orphanage, and that there was no reason for him not to provide for the Orphanage at Charleston, where his fortune had been made, and leave that fortune to four wealthy men in Brooklyn, N. Y., whom he had only come to know as metal manufacturers with whom he dealt in his own metal business.

"I think it is for this reason that we find the counsel arguing that the claimant's case is made only through leading questions of claimant's very able and honorable counsel and threatening 'the danger to the community of the doctrine of the claimant.'

"The master reports, 'I find that Duc approched Jenkins and commended him for his work, and expressed a desire to have built in the city of Charleston what he referred to as "two Poor Child Bread Companies," for the double purpose of teaching the negro orphans to make good bread, and of distributing the bread so made at cost to the colored people of Charleston,' and yet found, 'I find that the evidence not only negatives the idea but precludes any inference of a contract for any amount, definite or indefinite,

to be paid by Duc or his estate for the erection of the Poor Child Bread Company building.'

"In other words, as Mr. Cosgrove, the counsel for the Orphanage, well said, the master practically sustained his whole case, with the exception that Duc had obligated himself to pay for the building, erected at his request, for the 'Poor Child Bread Company.'

"The claim of the Orphanage, in my opinion, is amply supported by the greater weight of the evidence. At law no reasonable jury would have found otherwise. The administrator sought equity. Equity follows the law.

"The master has found that 'Rev. D. J. Jenkins has been an outstanding figure among the colored people of this community for a number of years; and it may be well said that he has done good work among orphans of the city of Charleston.' He might as well have found, as a matter of common notoriety (though of course this is not taken into consideration by this Court in reaching its conclusion), that Jenkins, though not as notorious, has done more efficient service for his race than Booker Washington ever did, and would have better manners and form than to lunch with a president. The official City Year Book of 1922, just issued, shows that his bands collected for the Orphanage the sum of $27,700.50. And who is it anywhere who has not listened to a 'Jenkins Band' somewhere? He has carried them over the world. This Court itself has heard them on the Strand in London, and at the Champs-Elysees in Paris; and it is said they have stood in the shadows of the Pyramids, where Napoleon stood, and broke the silence of the forty centuries which were looking down, with raw American syncopation.

"In the same book, in his report to city council, we find this statement (in reference to funds of the institution): 'We have not as yet received the funds left by the late Mr. Henry A. Duc; neither was the $15,546 that Mr. Duc ordered us to spend in building a Poor Child's Bread Com-

pany at 27 Franklin Street been paid by his executors.' (These matters not considered as stated.)

"The master also finds that Duc, deceased, 'was interested from a philanthropic standpoint in the progress of the colored race, particularly with reference to the provision of proper food and nourishment.'

"I think the evidence is clear and undisputed that about Christmas of 1919 Duc discussed with Jenkins the organization of two 'Poor Child Bread Companies,' at the Orphanage, and sent to the Orphanage samples of the kind of bread he wished made therein (page 11); that these so called 'Poor Child Bread Companies' are organizations of children, boys and girls, within the Orphanage (pages 11-17) for the purpose of baking bread and selling it to the poor at cost (page 7). Duc was a man of great eccentricity, but one who had acquired wealth. Apparently in recent years, his close financial advisor was the firm of Swartzel, Rheem & Hennesey, of Washington, D. C. Following his talk with Jenkins at Christmas, 1919, with regard to this matter, Duc visited Washington, and on January 13, 1920, his said brokers wrote to the Orphanage (not to Jenkins) a letter in evidence, making inquiry as to whether or not the Orphanage was incorporated, and stating 'a friend of yours is desirous of doing something to help you.' Mr. Rheem, a member of the firm, and the one who represented it in its dealings with Duc and the handling of his affairs, testified, in this connection, that the friend referred to was Duc, and that Duc had requested him to write the letter. He further testified in answer to the question if Duc had told him at the time, what he intended to do to help the Orphanage as follows: 'He stated that  *  *  *  well, he explained, in a general way that the Jenkins Orphanage was an institution which instructed colored children in various arts, and that it was his idea that the people of the United States were undernourished and underfed, and that their great need was for a lot of cooks who knew how to

make good bread, and that it was his idea to establish a company to teach the colored race of the south in the art of baking good bread, so that when they went into service they would be equipped to provide nourishing food for the country. That is about the general way he stated it.'

"This conversation occurred in Washington in January, 1920, as above set out, shortly after Duc's conversation with Jenkins at Charleston in 1919. It is the testimony of an apparently disinterested witness of high standing, and shows unquestionably Duc's desire and intention to erect the building in question in which the children of the Orphanage would be taught to 'bake good bread,' as among the 'various arts' taught in that institution. Duc, being still in Washington on March 24, 1920, directed Rheem (page 7 of his testimony) to charge his account with $100 and invest it in a real estate note payable to the 'Poor Child Bread Company,' this creature of his mind and heart.

"As to the actual contract or gift by Duc, the salient testimony appears in the record at pages 8, 9, 15, and 31. There were several conversations between Duc and Jenkins, and to one of these the stenographer of Jenkins was a witness. Record, page 42. The foregoing testimony in my opinion, conclusively supports not only the finding of the master 'that Duc approached Jenkins and commended him for his work, and expressed a desire to have built in the city of Charleston what he referred to as two "Poor Child Bread Companies" for the double purpose of teaching the negro orphans to make good bread, and of distributing the bread so made at cost to the colored people of Charleston,' but also that Duc intended to make himself liable for this object of his bounty and charitable contribution to a public benefit.

"The presence of Duc at the Orphanage during this period is abundantly proven by many witnesses. It was Mr. A. J. Riley, a commissioner of the Orphanage, who corroborates Jenkins that it was he who pointed out Duc to Jenkins as a man of great wealth, and that this incident

occurred at the time that he (Riley) was 'there seeing about work on the new building' (testimony of Riley, pages 3, 4). It was after this that the work went through in earnest.

"The evidence further shows that Duc was a man of peculiar habits and mysterious manner, and did not conduct business as an ordinary business man does. The testimony of both Rheem and Riley corroborates Jenkins in this regard. In fact Rheem testifies Duc would never sign any kind of paper or give a receipt, so peculiar and mysterious was he.

"That Duc was interested in the negro race in Charleston in unquestioned. In 1910 he made a will, which is in evidence, by the terms of which he gave all of his estate to the other defendants in this case in trust, however, to convert the same into bonds and to pay the proceeds thereof to certain institutions, one-fourth of the income to be paid to any incorporated colored orphanage in the city of Charleston. The Jenkins Orphanage was then, and is now, according to the testimony, the only institution of that type in Charleston. This will of 1910 and the letter of Rheem of 1920 show plainly that Duc intended to do something substantial for this Orphanage.

"Having made his later and last will in 1918, by the terms of which he gave to said defendants (strangers in blood and men of wealth themselves), to the exclusion of his own blood, all of his estate, absolutely, it is reasonable to conclude that, his interest continuing, he decided to help the Orphanage during his life rather than after his death through a trust. He, therefore, adopted the scheme of creating a new department in the Orphanage in which the children would be taught the art of baking good bread—his hobby.

"The suggestion of counsel opposing this claim that the 'Poor Child Bread Company' is an independent organization is, I think, unsupported in the record. The testimony shows that it is nothing more or less than a new department

in the Orphanage. The advertisement in evidence shows that this so-called company was made up of 'seven boys and girls of the Orphanage,' and in this connection a witness testifies at page 7 : 'Q. What is a poor child bread company? A. Baking bread and selling it to the people at cost.' And again at page 17: 'Q. Did you incorporate this company? A. Got one of the teachers to do it. Miss Moore to select seven of the most intelligent children.'

"While it is true that the testimony does not show exactly what the building was to cost (a matter probably impossible of ascertainment at that time), yet it does disclose that several conversations were had between Jenkins and Duc with regard to the erection of it; that Duc was in and around the Orphanage and the site of the new buliding (which it just across the street from the Orphanage) during the course of its construction, and after the ground had been broken and the foundation laid; and that the plans were discussed between Jenkins and Duc (page 24). On more than one occasion Duc told Jenkins he was slow, to go ahead, the money was waiting (pages 6, 8, 9, 11). The inference is that the cost would be reasonably agreed upon, within the bounds of such computation upon the ideas considered.

"There is no question made about the reasonableness of the amount of the claim. In fact, it is stipulated in the record 'that the account as filed by the Orphan Aid Society shall be accepted' (page 61). The gift is for poor children, and its object is for their vocational education. The beneficiaries are definite, and the object of the gift is charitable in its nature. Such gifts are favored by properly constituted Courts, especially under the social utilitarian idea of the administration of law, probably the strongest school of thought now prevailing in sociological jurisprudence. The amount claimed is reasonable; near as definitely established as could be at the time of the meeting of the minds

of the parties, and within their contemplation.   It has been made sure.   '*Id certum est quod reddi potest certum.*'

"In addition to the foregoing principles, there is no doubt of the liability of the estate for an oral promise, which has been executed by performance.   See *Furman University v. Waller,* 124 S. C., 68.

"In respect to the contention of the bank and the devisees contesting the claim as to letters written by Jenkins and delay on his part in filing the claim, it will be observed from the testimony that the first will under date of 1910 by the terms of. which, as already stated, the Orphanage was one of the beneficiaries, was not probated until some time in 1921.   It was the position of Jenkins that, so long as the Orphanage was a beneficiary, it was unnecessary to file this claim.   However, upon the discovery of the second will of 1918 and its probate in the early part of 1922, and it then appearing that the Orphanage was not a beneficiary, he filed this claim.   The evidence supports this view.   See page 27.   'Q. After Mr. Duc died your expectation was to receive the money under this will?   A. Yes.'

"My idea is, as to the many and inconsistent letters which Jenkins wrote, as the agreement by which Duc was to pay for the bakery and after he had learned from Riley that Duc was a wealthy man, he became obsessed with the idea that the Orphanage would receive a very large sum from Duc by will, and, while pursuing this idea and in quest of a will which he believed to exist, the small sum agreed upon for the bakery became obscured in his mind by the vastly larger sum expected by will, and even after the second will he still believed a later will would be found whereby the Orphanage would receive an immense sum, in which the claim for the bakery would be insignificant.   The correspondence shows that many of the letters are appealing and pitiful, met as they have been unflinchingly and with the point blank charge in the answer that the claim 'is a fictitious claim and unsupported by any facts whatsoever.'

'Truth,' it is said, 'is sometimes stranger than fiction,' and I think we may make an application of that adage here.

"The letter from Jenkins to Henri Pecord, the *non de plume* of Duc (furnished Jenkins), shows in my opinion that Duc and Jenkins had planned the erection of this bakery, for the letter reports its erection and the estimated cost thereof, concluding with the statement that with the help of Duc and others the work would be carried on. Much has been made against claimant of the use of the expression 'others,' but reflection satisfies the mind from the testimony that even after the building was constructed there would be many incidentals towards getting it equipped and going, and there is no doubt but that Jenkins had in mind assistance from others along this line.

"I have given much thought and study to this controversy, and have taken much pains in working out the details. There was very able argument before me, and, feeling convinced that the conclusions which I have reached are correct: It is therefore ordered, adjudged, and decreed that the exceptions herein be sustained, and that the Orphan Aid Society of the Jenkins Colored Orphanage have judgment against plaintiff in the sum of $15,000, with interest thereon at the rate of 7 per cent. per annum from the date of the filing of the claim with the administrator. It seems that the cost of the building ran higher than this, but I am satisfied that the claimant is confined to the amount of the claim as filed, with interest as aforesaid, and as prayed for in the answer.

"And it is so ordered."

*Mr. Henry Buist,* for plaintiff-appellant. *Mr. George L. Buist,* for defendants-appellants, cites: *Case distinguished:* 124 S. C., 68. *Competency of witnesses to transactions with deceased persons:* Code Civ. Proc. 1922, Sec. 708. *Where witness an officer or stockholder of corporation having interest adverse to estate of deceased:* 251 Mo., 721, 158 S. W., 369; 111 Minn., 105; 126 N. W., 534; 185 Mich.

148; 151 N. W., 692; 271 Ill., 395; 111 N. E., 272; 49 Colo., 268; 112 P. 783; 168 Ala., 469; 53 So., 228; 101 Ga., 62; 28 S. E., 494; 24 Ky. L. Rep., 1799; 72 S. W., 318; 199 Ill., 228; 65 N. E., 323; 46 W. Va., 99; 33 S. E., 108.

*Messrs. Logan & Grace* and *John I. Cosgrove,* for respondent, cite: *Appeal on merits in equity cases:* 124 S. C., 506; 92 S. C., 113. *Where witness an officer of corporation having interest adverse to estate of deceased:* 102 S. E., 145; 27 R. C. L., 507; 21 A. L. R., 930; 28 R. C. L., 507. *Where witness an agent of principal having interest adverse to estate of deceased:* 72 S. C., 560. *Witness having indirect interest adverse to estate of deceased:* 90 S. C., 473; 53 S. C., 22. *Statute regulating competency of witnesses construed:* 11 Rich., 405; 3 S. C., 423; 9 S. C., 392; 4 McC., 311; 11 S. C., 122; 23 S. C., 439. *Witness made party to render him incompetent:* 28 R. C. L., 502. *Gift of undetermined amount:* 26 S. E., 717. *Chancellor not influenced by incompetent testimony before him:* 93 S. C., 511; 94 S. C., 62. *Case governed by:* 124 S. C., 68; 117 S. E., 356; 78 S. E., 1075; Ann. Cas., 1914-D, 136.

May 7, 1925.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

This action was commenced by the service of a summons and complaint, dated May 25, 1923, by the Atlantic Savings Bank, as administrator of the estate of H. A. Duc, deceased, praying for instructions of the Court as to whether to pay a certain claim for $15,000 filed against the said estate by the Orphan Aid Society of the Jenkins Colored Orphanage, acting through D. J. Jenkins. The claimant and D. J. Jenkins, and the ultimate beneficiaries of the will (who are primarily interested in the outcome of the dispute), were all made parties defendant. The claim of the Orphan Aid Society was based on an alleged verbal contract with H. A.

Due to pay for the erection of a building for the "Poor Child Bread Company." The issue in the case was whether the said claim should or should not be allowed. A general order of reference was taken, referring the case to F. K. Myers, Esq., master, to take testimony and to report the same, with his conclusions of law and fact. The master filed his report on April 19, 1924, finding that the claim was not supported in fact or in law, and recommending its disallowance. Thereafter the defendant, the Orphan Aid Society of the Jenkins Colored Orphanage, filed exceptions to the master's report. These exceptions were heard before his Honor, Judge Memminger, at chambers, who entered a decree dated June 17, 1924, sustaining the exceptions to the master's report. This appeal has been taken from the said decree.

The able decree of Judge Memminger, which the appellants complain of by the exceptions, will be reported. In our opinion the evidence supports the decree of his Honor, and, as this is a suit in equity on the merits, the appeal is from the findings of the Circuit Judge on the facts.

It is incumbent on the appellants, therefore, to show that the decree of his Honor is against the weight of the evidence. Unless the appellants can demonstrate that the decree of Judge Memminger is against the preponderance of the evidence, this Court will not disturb it.

The evidence in the case was taken before the master. Under the law it is his duty to take all of the testimony offered and report it to the Court. Even if incompetent testimony was in evidence, as this was not a jury trial, but a trial before the judge, it is reasonable to suppose his Honor, in making his conclusions as to the facts of the case, did not base his opinions upon anything but competent, relevant testimony. *Leland v. Morrison,* 92 S. C., 511; 75 S. E., 889, Ann. Cas., 1914B, 349. *Kleckley v. Hook,* 94 S. C., 62; 77 S. E., 735. *Taylor v. Jackson,*

92 S. C., 13; 75 S. E., 275. *Simmons v. Pender,* 124 S. C., 506; 117 S. E., 731.

All the exceptions are overruled, and judgment affirmed.

MR. CHIEF JUSTICE GARY and MR. ACTING ASSOCIATE JUSTICE JOHNSON concur.

MR. JUSTICE MARION dissents.

MR. JUSTICE COTHRAN did not participate.